**Kelly SWALES, et al., Plaintiffs,**

v.

**TOWNSHIP OF RAVENNA,
et al., Defendants.**

**No. 5:95 CV 2115.**

United States District Court,
N.D. Ohio,
Eastern Division.

Oct. 20, 1997.

Lawrence A. Sutter, Thomas P. Mannion, Reminger & Reminger, Clevand, OH, Joseph Giulitto, Paula C. Giulitto, Giulitto & Berger, Ravenna, OH, for Plaintiffs.

Randolph L. Snow, Thomas W. Conners, Black, McCuskey, Souers & Arbaugh, Canton, OH, for Defendants.

## ORDER

SAM H. BELL, District Judge.

### I. INTRODUCTION

Now before the court is a motion for summary judgment filed. by Defendants Township of Ravenna, Ravenna Township Police Department, and Larry Carver. (Docket # 32.) Plaintiffs Kelly and David Swales filed this action against Defendants pursuant to 42 U.S.C. § 1983 and Ohio state law. Defendants argue that there are no genuine issue of material fact in this case, and that

they are entitled to judgment as a matter of law. For the reasons that follow, the court agrees, but only in part. Consequently, the court shall grant Defendants' motion in part and deny it in part. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## II. BACKGROUND

This case arises out of a series of events that took place in 1994 at 4361 Skeels Road in Ravenna, Ohio. In 1994, the Ravenna Township Police Department (the "RTPD") received numerous complaints about drug activity at a residence at that address. Consequently, in June 1994, they began an investigation of these complaints and placed the residence under surveillance. The surveillance over the next four months did not occur without incident. For example, the police were subject to gunfire originating from the residence. (Carver Aff. ¶ 5.) In addition, the police learned that at least one other individual had also been fired upon during the surveillance period. (*Id.* ¶ 6.)

As part of their ongoing investigation, on September 25, 1994, the RTPD arranged an undercover drug buy at a residence two blocks away belonging to Ron Kenney. During the buy, Kenney bicycled to the Skeels Road residence, and returned back to his residence before delivering eight rocks of cocaine to the undercover police officers. (*Id.* ¶¶ 7–8.) With the help of a confidential informant ("CI"), the police then arranged to make a second undercover buy at the Skeels Road residence on the evening of October 1. That night, the CI approached the residence while accompanied by an undercover police officer. After a brief argument at the door to the residence, the CI was slapped in the face by an occupant named Keith Watts. Thereafter, the CI swore out a criminal complaint against Mr. Watts, asserting that Watts had committed a misdemeanor assault of the first degree. In response to the complaint, officers immediately requested that a judge issue an arrest warrant for Watts. In addition, they went to the home of the municipal court clerk in order to take her to the court to process the warrant. (*Id.* ¶¶ 9–12.)

After securing the warrant for Watts' arrest, approximately ten officers, including RTPD Chief Larry Carver, arrived at the Skeels Road residence to execute the warrant. When they arrived, the officers observed a number of people standing around a bonfire in the front yard. They also observed a number of others running from the house and discarding drugs and drug paraphernalia. (*Id.* ¶ 15.) Watts himself ran into the house. (*Id.* ¶ 16.) Consequently, Chief Carver, along with two other officers, followed him inside and placed him under arrest. (*Id.* ¶ 17.) Chief Carver then instructed officers to search each person on the premises for weapons and check each person for any outstanding arrest warrants. (*Id.* ¶ 19.) He further instructed that any persons who were not carrying weapons and who had no outstanding warrants were to be released. (Carver Dep. at 79.)

Minutes before the officers had returned to execute the warrant, Kelly and David Swales had arrived at the Skeels Road residence in a pickup truck. (Kelly Swales Aff. ¶ 4.) Ms. Swales had previously been seen at the residence during the period of surveillance. As part of the initial search of all those on the premises, Ms. Swales was told to remove her jacket and empty out all of her belongings from the jacket's pockets. (*Id.* ¶ 7.) A RTPD officer next searched her cigarette case, and other belongings emptied from her pockets, for contraband such as weapons and drugs. (*Id.* ¶ 8.) The officer found no contraband, and returned the case to Ms. Swales. Ms. Swales then sat on a bench, as instructed, and placed her cigarette case beside her. (*Id.* ¶ 9.) Subsequently, an unknown male picked up the case, opened it, and removed a cigarette before being instructed by an officer to put the cigarette down. (*Id.* ¶ 14.) The male then replaced the cigarette in the case and put it back on the bench where he had found it. (Swales Dep. at 40, 42.)

After they were found not to be the subject of any outstanding warrants, Plaintiffs were told that they were free to go. (*Id.* ¶ 11.) As she was leaving, Ms. Swales left her cigarette case on the bench. (*Id.* ¶ 12.) An officer reminder reminded her to take the case with her, and Ms. Swales returned to the bench to pick it up. Before she could leave, however, a second officer insisted that

the case be searched again. (*Id.* ¶ 18.) Upon searching the case, the officer found a small rock wrapped in cellophane. Despite Ms. Swales' protests to the contrary, no officer conducted a field test of the suspect rock. (*Id.* ¶ 19.) Furthermore, no officer made an attempt to identify the male who had handled the case during the period between the searches. (*Id.* ¶ 15.) Ms. Swales was subsequently placed under arrest. (Kelly Swales Dep. at 51–53.)

After Ms. Swales was placed under arrest, RTPD Officer Michelle Nevling conducted a second search of her person. (*Id.* at 48.) Officer Nevling was called to the scene by her husband Officer Robert Nevling, at the direction of Chief Carver. (Nevling Dep. at 85.) In describing the reason for calling his wife to the scene to conduct the search, Robert Nevling declared that his wife's presence was consistent with the RTPD practice of having female officers do "Terry" searches of female suspects. (*Id.* at 83.) This second search included "remov[ing] [Ms. Swales'] coat, pull[ing] her clothing away from her body, remov[ing] her socks and shoes and [allowing Michelle Nevling] ... to examine her hair, head, ears, arms, legs and torso for drugs[.]" (Kelly Swales Aff. ¶ 23.)

After finding the rock, the officers requested Ms. Swales' permission to search a purse belonging to her in the pickup truck in which she arrived. (Nevling Dep. at 92.) They then proceeded to search both the truck and the purse contained therein. In collecting evidence, the officers found a film canister that appeared to contain cocaine powder residue. (*Id.* at 94.) Ms. Swales was then taken to the Portage County Jail, where she was booked, strip searched, and held until October 3, 1994. (Kelly Swales Aff. ¶ 9; Kelly Swales Dep. at 68–69.)

That same night, the police also took custody of the Swales' pick-up truck. Lamont Marshall, who appeared to the officers to own the property on which the truck was parked, had demanded that David Swales remove the vehicle. (Carver Dep. at 130.) In response to Mr. Marshall's demand, RTPD officers informed Mr. Swales that he could not leave the truck on the premises. Because they believed Mr. Swales to be under the influence of drugs and thus incapable of safely operating the truck, the officers gave him a choice. He could either arrange to have his truck towed, or a RTPD officer could drive the truck to a location from which the Swales could recover it at a later time. Given this choice, Mr. Swales agreed that the officers could drive the truck away from the property. (*Id.* at 121.) On October 2, 1994, Chief Carver decided formally to confiscate the truck. He soon changed his mind, however, and left the paperwork for the confiscation incomplete. (Carver Aff. ¶ 30; Carver Dep. at 123.) Nevertheless, on October 3, 1994, RTPD officers informed the Swales that they would not be able to recover the truck on that day without proof of ownership and insurance. (Carver Aff. ¶ 32; Swales Aff. ¶ 27.) Plaintiffs did not recover the truck until November 25, 1994. (*Id.* ¶ 30.)

During the period the RTPD held the truck, the Swales were stopped two more times by RTPD officers. (Kelly Swales Dep. at 118, 129, 131.) During a stop on October 20, 1994, in which Chief Carver participated, Ms. Swales consented to a search of her automobile. (*Id.* at 129.) The search revealed two rocks which were subsequently determined to be cocaine. (Carver Dep. at 145.) In addition, on at least three separate occasions during that period, the Swales cooperated with the RTPD by serving as confidential informants. On two of those occasions, the Swales participated in drug buys for the RTPD. (Kelly Swales Aff. ¶¶ 43–45.) On a third occasion, Ms. Swales attended a party at which underage drinking was suspected, and assisted the officers in their investigation by confirming that such drinking, along with drug use, had in fact occurred. (*Id.* at 46.)

### III. SUMMARY JUDGMENT

In *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir.1993), the Sixth Circuit Court of Appeals summarized the standard of review governing motions for summary judgment under Federal Rule of Civil Procedure 56:

Summary judgment is appropriate where "there is no genuine issue of material fact ... and the moving party is entitled

to judgment as a matter of law." ... [The] court must view all facts and inferences drawn therefrom in the light most favorable to the nonmoving party.

The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim.

"By its very terms, this standard provides that the existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party. If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted."

(citations omitted). Thus, the court shall analyze Defendants' present motion with this standard in mind.

## IV. *LAW AND ANALYSIS*

### A.

■ In their complaint, Plaintiffs assert a variety of claims against Defendants under both state and federal law. In response, Defendants contend that Plaintiffs can prove no facts that would entitled them to judgment against either Chief Carver, the Township of Ravenna or the RTPD. Defendants first argue that Chief Carver is protected against judgment on Plaintiffs' federal claims under the doctrine of qualified immunity. "Qualified or 'good faith' immunity is an affirmative defense that is available to government officials performing discretionary functions." *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992). A state official is entitled to qualified immunity when his conduct was objectively reasonable in light of clearly established rules and the information then possessed by the official. *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635,

639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)); *see also Johnson v. Fankell,* —— U.S. ——, ——, 117 S.Ct. 1800, 1803, 138 L.Ed.2d 108 (1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Once the defendant has presented facts to suggest that he acted within the scope of his discretionary authority during the incident in question, the plaintiff bears the ultimate burden of showing that the defendant is not entitled to qualified immunity. *Rich v. City of Mayfield Heights,* 955 F.2d at 1095 (citing *Wegener v. Covington,* 933 F.2d 390, 392 (6th Cir.1991)).

■ Thus, when faced with a motion for summary judgment based on qualified immunity, a court must consider two issues:

(1) whether the plaintiff has asserted violation of [a] known civil constitutional right; and

(2) whether the constitutional right was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights.

*Hutsell v. Sayre,* 5 F.3d 996, 1003 (6th Cir. 1993) (citing *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)); *see also Turner v. Scott,* 119 F.3d 425, 429 (6th Cir.1997) (citing *Siegert; Purisch v. Tennessee Technological Univ.,* 76 F.3d 1414, 1423 (6th Cir.1996)). If the court answers either question in this two-part analysis in the negative, then it must grant summary judgment. Accordingly, the court first considers whether Chief Carver's conduct towards Plaintiffs violated their constitutional rights. *See Silver v. Franklin Township,* 966 F.2d 1031, 1035 (6th Cir.1992) ("[B]efore reaching a qualified immunity issue a court should determine whether there has been a constitutional violation.") (citation omitted).

### 1.

■ Plaintiffs assert four federal claims against Chief Carver and the other defendants in four separate counts of the complaint. In each of these counts, they bring a claim under 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must identify

a right secured by the United States Constitution which was violated by a person acting under color of state law.[1] Plaintiffs first specifically assert that Defendants unlawfully detained and maliciously prosecuted Kelly Swales, in violation of her due process rights under the Fifth and Fourteenth Amendments. (Compl. at ¶ 39.) Although Plaintiffs allege a lack of due process in the complaint, they do so without specifying either the procedural or substantive nature of those rights. In their motion for summary judgment, Defendants characterize Plaintiff's due process claim as substantive and assert that it is barred. (Mot. for Summ. J. at 12.) In response, Plaintiffs state that their due process claim is both substantive and procedural. (Br. in Opp. at 25.) Because Plaintiffs assert a violation of their right to both substantive and procedural due process, albeit in response to Defendants' contention that it is solely a substantive claim, and because that characterization comports with Plaintiffs' assertion in Count One of their complaint, the court must address both due process elements.

■ The Supreme Court has long distinguished between the substantive and procedural components of the Fourteenth Amendment's due process clause. Procedural due process requires that any deprivation of life, liberty or property by the state is done fairly and is not arbitrary. In contrast, substantive due process requires that the state refrain from certain deprivations of life, liberty or property altogether. The state must do so because these deprivations deny rights explicitly recognized in the Bill of Rights or which are so fundamental that any deprivation would "shock the conscience" of the court. *Mansfield Apartment Owners Ass'n v. City of Mansfield,* 988 F.2d 1469, 1474 (6th Cir.1993). The rights in this second category are few, and tend to fall into narrowly defined categories such as marriage, family, procreation and the right to bodily integrity. *Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994). Because of the potential for the recognition of an almost unlimited number of substantive due process rights, and the constitutional havoc that would wreak, the Court has moved very cautiously in expanding the scope of its substantive due process analysis. *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992).[2]

■ Although both the Fifth and Fourteenth Amendments establish a right to due process, the Fifth Amendment is inapplicable to the instant case, for its provides protection against actions of the federal, not state or local, government. *See Verba v. Ohio Casualty Ins. Co.,* 851 F.2d 811, 813 (6th Cir. 1988); *Bettio v. Village of Northfield,* 775 F.Supp. 1545 (N.D.Ohio 1991). Moreover, the court finds that Plaintiffs' claim under the Fourteenth Amendment is also invalid, whether they are substantive or procedural in nature.

In *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), Illinois authorities issued an arrest warrant for the defendant, Albright. After learning of the warrant, Albright surrendered to a police

---

**1.** 42 U.S.C. § 1983 provides in pertinent part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**2.** In *Stemler v. City of Florence,* 126 F.3d 856, 866 n. 10 (6th Cir.1997), Judge Boggs skillfully summarized the distinction between substantive and procedural due process as follows:

In contrast to procedural due process, which guarantees that individuals will be afforded fair procedures before they are deprived of life, liberty or property, substantive due process protects individuals against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). *But cf.* JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 18 (1980) suggesting that non-textual constitutional claims would be better analyzed under the Privileges and Immunities Clause of the Fourteenth Amendment: "Familiarity breeds inattention; and we apparently need periodic reminding that 'substantive due process' is a contradiction in terms—sort of like 'green pastel redness.'"

detective. *Id.* at 268–69, 114 S.Ct. at 810–11. The warrant, however, was based on charges that did not state an offense under Illinois law. Consequently, the state dropped the charges. Albright then filed suit under § 1983 against the arresting officer, alleging that the arrest, in the absence of probable cause, deprived of his right to substantive due process under the Fourteenth Amendment. After the Seventh Circuit Court of Appeals affirmed the district court's dismissal of suit under Fed. R. Civ. Pro. 12(b)(6), the Supreme Court granted certiorari. *See Albright v. Oliver,* 507 U.S. 959, 113 S.Ct. 1382, 122 L.Ed.2d 757 (1993).

▪▪▪ The Court then held that the suit had been properly dismissed, for claims of pretrial deprivation of liberty are properly brought under the Fourth Amendment, not the Fourteenth. "Where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989)). Consequently, in this case, in which the Plaintiffs assert claims of unlawful detention and malicious prosecution that are prohibited, if at all, under the Fourth Amendment, Plaintiffs may not maintain those claims pursuant to the substantive due process protections of the Fourteenth Amendment.[3]

▪▪▪ Nor may they maintain such claims pursuant to that Amendment's procedural due protections. When considering a procedural due process claim, a court must: (1) establish that a deprivation of life, liberty or property interest has taken place; and (2) determine how much process is due. *Ingraham v. Wright,* 430 U.S. 651, 673–674, 97 S.Ct. 1401, 1413–1414, 51 L.Ed.2d 711 (1977). However, before a court may consider a § 1983 claim alleging a lack of procedural due process, Plaintiffs must plead and prove the inadequacy of state procedures, including state tort remedies. *Mansfield Apartment Owners v. City of Mansfield,* 988 F.2d 1469, 1475 (6th Cir.1993); *Wagner v. Higgins,* 754 F.2d 186 (6th Cir.1985); *Vicory v. Walton,* 721 F.2d 1062, 1063 (6th Cir.1983). Although the Circuit initially applied the requirement of proving the inadequacy of state procedures only to deprivations of property, it later extended this requirement to claims in which a plaintiff alleges a deprivation of liberty. *Wilson v. Beebe,* 770 F.2d 578 (6th Cir.1985). In both Count One and their Brief in Opposition, Plaintiffs have not made any assertions at all about the adequacy, or inadequacy, of state process, as it relates specifically to their personal detention and prosecution claims. Because Plaintiffs have failed to carry this burden, the court must grant summary judgment to Chief Carver

---

**3.** The Supreme Court has explicitly recognized a Fourth Amendment right against unlawful detention. *See, e.g., Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Plaintiffs assert such a right in Count Two of their complaint, and this court shall address this assertion in its general consideration of Count Two below.

The Supreme Court has not, however, recognized a Fourth Amendment right against malicious prosecution. In fact, in *Donovan v. Thames,* 105 F.3d 291, 297 n. 7 (1997), a panel of the Sixth Circuit Court of Appeals observed that "*Albright* left open the question whether a claim for malicious prosecution could be brought under the Fourth Amendment . . . ."

In Count Two, Plaintiffs effectively bring the charge of malicious prosecution under the Fourth Amendment. In her concurrence in *Albright,* Justice Ginsberg noted that any malicious prosecution charge against a police officer is generally "anomalous." *Albright v. Oliver,* 510 U.S. at 271, n. 5, 114 S.Ct. at 812, n. 5 (Ginsberg, J., concurring). In particular, she notes that "the principal player in carrying out a prosecution . . . is not police officer but prosecutor," and that, as a subordinate figure, a police officer likely shares a prosecutor's absolute immunity. *Id.* (citing *Burns v. Reed,* 500 U.S. 478, 487–492, 111 S.Ct. 1934, 1939–42, 114 L.Ed.2d 547 (1991); *Briscoe v. LaHue,* 460 U.S. 325, 326, 103 S.Ct. 1108, 1110, 75 L.Ed.2d 96 (1983)). Justice Ginsberg would, however, recognize such a malicious prosecution claim when the plaintiff alleges that the officer perpetuated an initial seizure by providing misleading testimony in proceeding against the plaintiff. Although not bound by the concurrence of a single justice, the court finds Justice Ginsberg's reasoning persuasive. Here, Plaintiffs make no allegations concerning the officers actions in subsequent proceedings against them. Therefore, the court finds that Chief Carver is nonetheless protected against judgment under the doctrine of absolute immunity for prosecutorial activities.

with respect to the procedural, as well as the substantive, character of Plaintiffs' due process claim.

### 2.

■ In Count Two of their complaint, Plaintiffs charge that Chief Carver and the other Defendants deprived Kelly Swales of her right be free from unreasonable searches and seizures under the Fourth Amendment.[4] Specifically, they bring an action under § 1983 in which they allege that Defendants searched and abused Ms. Swales "recklessly, willfully, wantonly, and/or with deliberative [sic] indifference." (Compl.¶ 42.)

#### a.

■ ■ First, Plaintiffs assert that Ms. Swales was impermissibly detained. Plaintiffs acknowledge that the officers entered the Skeels Road residence in execution of a valid warrant for Mr. Watts' arrest. When armed with a warrant, an arresting officer may enter a residence in order to execute that warrant. *See Payton v. New York,* 445 U.S. 573, 602, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). Thus, the officers were justified in entering the Skeels Road residence in order to execute the warrant for Watts' arrest. Once inside, they were also justified in making a "protective sweep" of "spaces immediately adjoining the place of arrest" in order to minimize the threat of attack from others lying in wait. *See Maryland v. Buie,* 494 U.S. 325, 333, 110 S.Ct. 1093, 1097, 108 L.Ed.2d 276 (1990). Moreover, the Defendants were entitled to detain any individuals found within those spaces, because any detention took place during the course of a valid search. *See Michigan v. Summers,* 452 U.S. 692, 703, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981). Plaintiffs offer no evidence that Ms. Swales was outside the area "immediately adjoining the place of arrest." As a result, the court finds that Ms. Swales' rights under the Fourth Amendment were not violated when she was detained pursuant to the officers' arrest of Mr. Watts.

■ Even if the arrest of Watts were a mere pretext for searching the premises, as Plaintiffs suggest, the officers were entitled to detain Ms. Swales without violating her Fourth Amendment rights. In *Whren v. United States,* 517 U.S. 806, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996), the Supreme Court held that "the fact that [an] officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.... Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." (quoting *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978).) *See also Ohio v. Robinette,* 519 U.S. 33, —— – ——, 117 S.Ct. 417, 420–421, 136 L.Ed.2d 347 (1996) (applying *Whren* ). Thus, whether or not the officers used Watts' purported assault as a means of gaining entry to the residence, they were justified in acting on that assault to enter the house and detain Ms. Swales.

#### b.

Second, Plaintiffs challenge the officers' initial search of Ms. Swales' person. During the search, they asked Swales to remove her coat and empty her pockets. (Swales Aff. ¶ 7.) The search revealed a cigarette case, and the officers proceeded to inspect the case for weapons and drugs, but found nothing. (*Id.* ¶ 8.) Several minutes later, after Ms. Swales had temporarily abandoned the case, and another individual had gained access to it, Plaintiffs assert that the officers stopped

---

4. "The Fourteenth Amendment incorporates the Fourth Amendment, prohibiting unreasonable searches and seizures by the states." *O'Brien v. City of Grand Rapids,* 23 F.3d 990, 996 (6th Cir.1994) (citing *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).)

Plaintiffs also allege that Defendants deprived them of their rights under the Fifteenth Amendment. That Amendment provides, in pertinent part, that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. Amend. XV. Plaintiffs' claims do not appear to relate to the protections afforded under this Amendment in any way. Therefore, the court finds that Plaintiffs' allegation is without merit.

Swales again and searched the case one more time.

Plaintiffs argue specifically that both these searches violated Ms. Swales' Fourth Amendment rights. Plaintiffs concede that Ms. Swales submitted to the initial search of her person for weapons, (Br. in Supp. at 28), and indeed, a subject's consent can justify what might otherwise be an invalid search. *See Illinois v. Rodriguez,* 497 U.S. 177, 183, 110 S.Ct. 2793, 2798, 111 L.Ed.2d 148 (1990) (holding that "[t]here are various elements ... that can make a search ... 'reasonable'—one of which is the consent of the person" whose person or premises will be searched.). Moreover, under *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1970), the officers were justified in frisking Ms. Swales even without her consent if they reasonably suspected that she was armed and dangerous.

Nevertheless, Plaintiffs vigorously dispute the validity of the officers' searches of Ms. Swales' cigarette case in the absence of a warrant. Defendants argue that the officers were justified in searching the case without a warrant in light of "exigent circumstances" surrounding the search. "A search is per se unreasonable, and thus violates the Fourth Amendment, if the police making the search have not first secured from a neutral magistrate a warrant that satisfies the terms of the Warrant Clause of the Fourth Amendment." *Robbins v. California,* 453 U.S. 420, 423, 101 S.Ct. 2841, 2844, 69 L.Ed.2d 744 (1981). Courts have long recognized, however, certain exceptions to the warrant requirement whenever the government can demonstrate "exigent circumstances". *See United States v. Biggs,* 70 F.3d 913, 915 (6th Cir.1995) (*"Absent exigent circumstances,* police officers may not undertake a warrantless search.") (emphasis added); *see also United States v. Roark,* 36 F.3d 14, 17 (6th Cir.1994) (noting that "[t]he burden is on the government to demonstrate that ... exigent circumstances exist ...").

Exigent circumstances, "something of a term of art, denotes the existence of" 'real immediate and serious consequences' "that would certainly occur were a police officer to 'postpone[] action to get a warrant.' "

*Welsh v. Wisconsin,* 466 U.S. 740, 751, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984) (quoting *McDonald v. United States,* 335 U.S. 451, 459–60, 69 S.Ct. 191, 195, 93 L.Ed. 153 (1948) (Jackson, J., concurring)). The phrase has been understood by the Supreme Court to comprise, generally, two separate sets of circumstances: 1) "the imminent destruction of vital evidence," *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963), and 2) the " 'need to protect or preserve life or avoid serious injury,' " *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (citation omitted), either of police officers themselves or of others, *Hayden,* 387 U.S. at 299, 87 S.Ct. at 1646.

Examples of "exigent circumstances" exceptions to the warrant requirement abound in Supreme Court case law: 1) the "automobile exception," *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); 2) search incident to arrest, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); 3) "inventory" searches, *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); 4) "hot pursuit," *Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 5) "stop and frisk," *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); 6) "border searches," *United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); 7) "plain view," *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) 8) "school searches," *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985); 9) "consent searches," *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); and 10) "administrative searches," *Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981).

*O'Brien v. City of Grand Rapids,* 23 F.3d 990, 997 (6th Cir.1994).

But in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the Supreme Court held that while exigent circumstances can justify the warrantless *seizure* of personal property, such as

a container, they do not necessarily justify a warrantless *search* of that same property. The Court considered the search of a footlocker after it had been seized and safely removed to the custody of federal agent. The Court first noted that "[t]he initial seizure and detention of the footlocker ... were sufficient to guard against any risk that evidence might be lost." *Id.* at 13, 97 S.Ct. at 2484. It then found that "[w]ith the footlocker safely immobilized, it was unreasonable to undertake the additional and far greater intrusion of a search without a warrant." *Id.;* *see also United States v. Wright,* 577 F.2d 378, 381 (6th Cir.1978) ("As the Court in *Chadwick* pointed out, the right to seize is not necessarily the right to search, since exigent circumstances might justify the former, but there are rarely critical circumstances requiring an immediate search once a package or bag is safely in the hands of the police.").

Consequently, in the instant case, the officers acted unreasonably in searching the case after they had assumed control of it. This case is not like *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), in which the Supreme Court permitted the warrantless search of a suspect's cigarette pack. In *Robinson,* the officers conducted the search incident to a lawful custodial arrest. Conversely, in this case, Ms. Swales was not placed under arrest until after the officers conducted the search. The Court specifically noted that "[i]t is the fact of the lawful arrest which establishes the authority to search, and ... in the case of a lawful custodial arrest a full search of the person [including his cigarette pack] is not only an exception to the warrant requirement, but is also a "reasonable" search under that Amendment." *Id.* at 235, 94 S.Ct. at 476. Thus, a reasonable jury could find that the officers violated Ms. Swales' Fourth Amendment rights in searching her cigarette case without a warrant.

Nevertheless, Chief Carver is still free of any liability for any constitutional violation arising from the searches of the cigarette case. As Plaintiffs do not dispute, Carver did not personally participate in the searches. Plaintiffs alternatively assert that

Carver remains liable under a theory of supervisor liability. In order to hold a supervisory employee liable under § 1983, a plaintiff must demonstrate that the employee "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984). *See also Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 727 (6th Cir.1996) (applying *Bellamy* ). Plaintiffs demonstrate neither in this case. At best, Plaintiffs note that Chief Carver was the author of the RTPD's Policy and Procedure Manual, and was present when the events at issue in this case took place. This, however, can hardly be deemed either encouragement of specific incident of misconduct or direct participation in such misconduct. *See Ghandi v. Police Dep't of the City of Detroit,* 747 F.2d 338, 352 (1984) (holding that "[a]s a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability."); *Bellamy,* 729 F.2d at 421 ("At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.") (citing *Hays v. Jefferson County,* 668 F.2d 869, 872–74 (6th Cir.1982)). Therefore, the court finds that, as a matter of law, Chief Carver is not liable for any constitutional violations arising out of the officers' search of the cigarette case.

c.

Third, Plaintiffs argue that the officers deprived Ms. Swales of her right to liberty when they placed her under arrest and took her into custody. The Fourth Amendment to the United States Constitution affords all citizens the right to be free from unreasonable seizures. In order to protect that right, while at the same time accommodating the state's need to control crime, an individual may not be arrested without a warrant absent probable cause. "The standard for arrest is probable cause, defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein v. Pugh,* 420

U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1975) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). The establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). " 'If probable cause to arrest has been established, [plaintiffs] cannot recover for a violation of civil rights arising out of such arrest.' " *Buchanan v. Sowa,* 592 F.Supp. 1009, 1015–16 (N.D.Ohio 1984) (citations omitted). *See also United States v. Barrett,* 890 F.2d 855, 861 (6th Cir.1989) (noting that a court must determine the existence of probable cause based on the "totality of the circumstances").

■ "[T]he existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor,* 60 F.3d 1211, 1215 (6th Cir.1995) (citation omitted). Plaintiffs argue that although the officers found a rock resembling crack cocaine in Ms. Swales' case, they failed, and indeed refused, to conduct a field test to confirm the identity of the substance. (*See* Nevling Dep. at 27–28.) They also argue that Ms. Swales had no prior criminal history, was not known to Detective Downey, the arresting officer, and was the only individual on the scene arrested for possession of drugs. Finally, they assert that an unknown individual gained possession of the case between the first search of the case, which revealed no incriminating evidence, and the second search, which produced a substance that the arresting officer *suspected* was crack cocaine.

■ These arguments could persuade a reasonable jury, at least in part. Admittedly, Plaintiffs err in effectively arguing that an arresting officer is *required* to conduct a field test to confirm or dispel what a reasonable person would suspect: that the substance found in Ms. Swales' case was cocaine. Neither the Supreme Court nor Sixth Circuit Court of Appeals has ever held that a field test is required to establish probable cause that a substance is illicit. Indeed, at least two other Circuits have explicitly rejected such an assertion. *See United States v.*

*Cook,* 949 F.2d 289, 292 (10th Cir.1991) (holding that "substantial grounds existed for believing that cocaine could be found ... [a]lthough [an officer] did not conduct a field test on the substance"); *United States v. Prandy–Binett,* 995 F.2d 1069, 1073 (D.C.Cir. 1993) (noting that it "did not share the [district] court's concern" that "without further investigation (presumably a field test), the officers could not know the specific nature of a defendant's alleged crime"). Moreover, neither Ms. Swales' previously unblemished criminal record nor the fact that the officers did not arrest others for illegal drug possession is particularly relevant to whether Ms. Swales possessed an illicit substance that evening. But a reasonable jury could find that another individual took possession of the case after it had been searched and cleared the first time, and placed the substance inside the case during the interim period. Moreover, the jury could also reasonably conclude that the arresting officers knew about or even directly observed that individual, but arrested Ms. Swales anyway. Thus, the court cannot find as a matter of law that the officers had probable cause, the sine qua non of a valid arrest, to take Ms. Swales into custody.

■ Because a reasonable jury could find that Ms. Swales' arrest was unconstitutional, it could also find that any search asserted to be incident to that arrest is also unconstitutional. *See Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969) (holding that a police officer making a lawful arrest may conduct a warrantless search of (1) the arrestee's person and (2) the area within the arrestee's immediate control). Defendants assert that the officers' post-arrest search of Ms. Swales' person and purse was so justified. (Mot. for Summ. J. at 17.) Alternatively, they contend that Ms. Swales consented to the searches, or at least to the search of her purse. (*Id.* (citing Nevling Aff. ¶ 10).) In her deposition testimony, however, Ms. Swales asserts that she did not even learn about the search of the purse until after the search was completed, (Swales Dep. at 58–59), and a reasonable jury could find her testimony credible. Finally, Defendants assert that they had probable cause to search

the purse, and cite the Supreme Court's decision in *California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). In *Acevedo*, the Court did uphold a warrantless search of a paper bag in an automobile which the police had probable cause to believe contained contraband. *Id.* at 573, 111 S.Ct. at 1987. But once again, a reasonable jury in this case could review the testimony of Ms. Swales and the circumstances surrounding the search of her purse and conclude that no such probable cause existed. Thus, the court finds that the validity of these searches is also appropriate for jury review.[5]

■ Nevertheless, as before, the Court finds no evidence to support a finding that Chief Carver was liable for any Fourth Amendment violation arising from Ms. Swales' arrest. Once again, Plaintiffs do not assert that Carver himself engaged in the allegedly unconstitutional act. In addition, they offer no evidence that he "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy*, 729 F.2d at 421. Consequently, the court finds that Chief Carver is entitled to summary judgment on Plaintiffs' claim as it relates to the arrest of Ms. Swales.

d.

■ Fourth, Plaintiffs argue that Chief Carver and the other officers unlawfully seized their pickup truck in violation of their rights under the Fourth Amendment. As noted above, after Defendants placed Ms. Swales under arrest, they drove the truck away from the Skeels Road residence. The Fourth Amendment protects individuals from unreasonable seizures just as it protects against unreasonable searches. *See* U.S. Const. Amend. IV. A police officer seizes tangible property for the purposes of the Fourth Amendment "when there is some meaningful interference with an individual's possessory interest in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1987).

■ Although Plaintiffs do not deny that David Swales agreed to having the officers drive the truck away, (Br. in Opp. at 11), they do assert that the officers continued to detain the truck so as to exceed the scope of any consent, and did so without a warrant. (*See, e.g.*, Ex. I (report describing the detention of the truck as a "confiscation").) "In the ordinary case, the [Supreme] Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983).

■ But in *Place*, the Court also recognized that under certain circumstances, "the risk of the item's disappearance or use for its intended purpose before a warrant may be obtained outweighs the interest in possession." *Id.* In such "exigent circumstances," an officer may seize the item if he has probable cause to believe that the item is either (1) evidence of a crime or (2) a fruit, instrumentality, or object of a crime. *Id.*; *Warden v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1651, 18 L.Ed.2d 782 (1967). The Sixth Circuit has recognized that an officer may seize a motor vehicle without a warrant if he has probable cause to associate the vehicle with criminal activity. *Autoworld Specialty Cars, Inc. v. United States*, 815 F.2d 385, 389 (6th Cir.1987). Plaintiffs do not dispute that the officers found a white substance resembling powder cocaine in a film canister located in Ms. Swales' purse inside the truck. In addition, Ohio law provides that an officer may seize any motor vehicle which is used to "possess, conceal, transport, receive or purchase contraband." Ohio Rev.Code § 2933.42 (West 1997). In fact, under § 2933.42, "[i]t is rebuttably presumed that a ... motor vehicle ... in or on which contraband is found at the time of seizure has been, is being, or is intended to be use in violation of ... this section." *Id.* Finally, the seizure took place during what

---

5. Unlike in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), Ms. Swales was not an occupant of the vehicle at the time of her arrest. Therefore, Defendants may not rely

upon the so-called "bright-line" rule of *Belton* to justify their search through the truck for the purse.

Plaintiffs themselves have characterized as a "drug raid," (Br. in Opp. at 12), in which the officers discovered significant quantities of drugs and drug paraphernalia. As a result, the officers had probable cause to believe that the truck was an instrumentality of criminality subject to forfeiture, and were entitled to seize Plaintiffs' truck without a warrant, even without his consent.

 Nevertheless, Plaintiffs contend that Defendants, including Chief Carver, refused to return the truck even after they had determined that the substance found therein was not cocaine. They also assert that Chief Carver would not return the truck unless they agreed to participate in a series of undercover operations on behalf of the RTPD. In support of their assertions, Plaintiffs offer the affidavit of Ms. Swales. (See Swales Aff. ¶¶ 36–37, 46, 51.) Furthermore, Carver's actions affect the "contours of [Ms. Swales'] right, [which] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Sheets v. Moore,* 97 F.3d 164, 166 (6th Cir.1996) *Cf. Gainor v. Rogers,* 973 F.2d 1379, 1385 (8th Cir.1992) ("The cases are legion in this and other circuits which establish that where there are genuine issues of material fact surrounding an arrestee's conduct it is impossible for the court to determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law."); *Enlow v. Tishomingo County,* 962 F.2d 501, 510 (5th Cir.1992) (When facts relied on to establish probable cause for arrest were in dispute, "[w]hether or not [defendant could] claim qualified immunity from [plaintiff's] Fourth Amendment claims remain[ed] a fact-disputed issue."). As a result, a jury could appropriately find that the seizure, although initially reasonable, was ultimately rendered unreasonable, and clearly so, by the subsequent actions of the RTPD officers, including Chief Carver.[6]

---

6. In *Bush v. Banks,* 103 F.3d 128, 1996 WL 668551 (6th Cir. Nov.18, 1996), an unpublished decision, the Sixth Circuit acknowledged that the subsequent detention of a person's vehicle, the condition of that detention, and the inadequacy

**e.**

 Fifth, Plaintiffs argue that after the October 1 incident, Chief Carver and the other RTPD officers repeatedly stopped them in their automobile and subjected them to search without any probable cause, in violation of their Fourth Amendment rights. In her deposition, however, Ms. Swales acknowledged that she was stopped by the RTPD on only two occasions after the incident. (Kelly Swales Dep. at 118, 129, 131.) Ms. Swales acknowledges that on the first occasion, her car swerved to the left of the center line of the road. (Compl. ¶ 24; Kelly Swales Dep. at 118.) She also acknowledges that on the second occasion, she consented to a search of her car after she was approached by RTPD officers in a convenience store parking lot. (*Id.* at 129.) Thus, the first time she was stopped, the officers had probable cause to pull her over, and, under the exigent circumstances at hand, were justified in doing so without a warrant. *See Whren v. U.S.,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Moreover, they had probable cause to search the car, and could do so without a warrant, upon viewing what looked to be two rocks of crack cocaine as David Swales got out of the car. *See Robbins v. California,* 453 U.S. 420, 423, 101 S.Ct. 2841, 2844, 69 L.Ed.2d 744 (1981) (citing *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)); *Colorado v. Bannister,* 449 U.S. 1, 3, 101 S.Ct. 42, 43, 66 L.Ed.2d 1. On the second occasion, the officers were entitled to search the car without violating the Fourth Amendment in light of Ms. Swales' consent to do so. *See Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Therefore, the court finds that it must grant summary judgment to Chief Carver as to Plaintiffs' claims arising from these stops.

**3.**

 In Count Three of their complaint, Plaintiffs allege that Chief Carver, the Township of Ravenna and the RTPD de-

of the process for recovery all implicate that person's right to be free from unreasonable seizure under the Fourth Amendment. *Id.* at 1996 WL 668551, *2.

prived Ms. Swales of her right to equal protection of the laws and impeded the due course of justice in violation of her rights under the Fifth and Fourteenth Amendments. (Compl.¶ 45.) [7] "The Equal Protection Clause commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' This provision creates no substantive rights. Instead, it embodies a general rule that States may treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill,* —— U.S. ——, ——, 117 S.Ct. 2293, 2297, 138 L.Ed.2d 834 (1997) (citations omitted). In both their compliant and Brief in Opposition, Plaintiffs do not explain, or even discuss, how Defendants' actions target a suspect class or fail to bear a rational relation to some legitimate end. Plaintiffs might also contend that they were subject to selective prosecution. "The courts have long held that a selective enforcement claim may be available even where there is probable cause for prosecution." *Stemler v. City of Florence,* 126 F.3d 856 (6th Cir.1997). As the Circuit noted in *Stemler,*

> [i]n order to state a claim of selective prosecution, a plaintiff must demonstrate three elements:

> First, [the state actor] must single out a person belonging to identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the *group* which the defendant belongs to.

*Id.* at 873. But in both their complaint and Brief in Opposition, Plaintiffs do not assert such a claim. "Generally, laws that apply evenhandedly to all 'unquestionably comply' with the Equal Protection Clause." *Id.* (citing *New York City Transit Authority v. Beazer,* 440 U.S. 568, 587, 99 S.Ct. 1355, 1366, 59 L.Ed.2d 587 (1979)). Consequently, the court finds that any claim of deprivation

of the right to equal protection is without merit.

■■■■■■ Furthermore, Plaintiffs fail to demonstrate how the officers' actions impeded the due course of justice. In *Mt. Healthy City School Dist. Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court acknowledged that a plaintiff may bring an § 1983 action against a governmental body if that body retaliated against the plaintiff for exercising a constitutionally protected right. *See also Bailey v. Floyd Co. Board of Ed.,* 106 F.3d 135, 144 (6th Cir.1997) (following *Mt. Healthy* ). In this case, Plaintiffs assert that, after the October 1 incident at Skeels Road, they were repeatedly stopped in their vehicle, subjected to searches, and coerced into assisting the RTPD in their undercover operations. They do not assert, however, what constitutional activities prompted these allegedly retaliatory acts. *Mt. Healthy* and its progeny do not offer an additional cause of action for a constitutional deprivation, such as an unreasonable search or seizure. Instead, these cases merely provide that an government actor may not be motivated to act against an individual because that individual has engaged in constitutionally protected behavior. Thus, because Plaintiffs fail to establish what constitutionally protected activities motivated Defendants' actions, the court finds that their claim in Count Three lacks merit.

### B.

■■■■■■ Defendants next argue that Ravenna Township is not liable on any of Plaintiffs' federal claims because the RTPD officers' actions were not taken pursuant to official municipal policy. In *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court abolished liability for violations of constitutional rights under the doctrine of respondeat superior, including those alleged against local governments. "[A] local government may not be sued under § 1983 for an injury inflicted by its employees or agents." *Monell,* 436 U.S. at 694, 98 S.Ct.

---

**7.** As before, the court notes that the Fifth Amendment is inapplicable, as it imposes limits on

federal, not state or local, action.

at 2037, 56 L.Ed.2d 611. Thus, Ravenna may not be held liable for the actions of its officers simply on the basis of its employment relationship with them. Nevertheless, municipalities are not wholly immune from § 1983 suits. "[I]t is when execution of·a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*

▮▮▮ Plaintiffs first argue that Chief Carver's "leadership and unwritten policy have proximately caused the violation of Plaintiffs['] rights," and that Chief Carver effectively set the policy for the RTPD. (Br. in Opp. at 34.) As police chief, Carver could certainly establish a policy that would bind the RTPD. But Plaintiffs fail to offer any affirmative evidence of Carver's "leadership and policy" to which they allude. A "non-moving party may not rely on his pleadings alone, but must demonstrate the existence of a genuine issue for trial by pointing to 'specific facts' that create such an issue." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Plaintiffs merely point to Carver's authority over the RTPD and his role in the events at issue in this case. A policy, however, requires more than just authority and participation in the acts of the department. It requires a "deliberate choice to follow a course of action ... from among various alternatives." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). Moreover, in their Brief in Opposition, Plaintiffs argue that Chief Carver and the other RTPD officers acted in "direct opposition to the guidelines set forth" in the department's official Policy and Procedure Manual. (Br. in Opp. at 33–34.) As a result, the court finds no evidence to support Plaintiffs' assertion that Chief Carver established a municipal policy or custom.

▮▮▮ Alternatively, Plaintiffs challenge the training that Ravenna and the RTPD provides its officers. A plaintiff may assert a claim against a municipality under § 1983 if it can establish that a deprivation of his constitutional rights was a result of inadequate police training. But in *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989), the Supreme Court held that "the inadequacy [of police training] may serve as a basis for Section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police comes into contact." In a footnote, the Court offered two examples of "deliberate indifference":

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force [citation omitted] can be said to be "so obvious," that the failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.
>
> It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

*Id.* at 390, n. 10, 109 S.Ct. at 1205 n. 10. Plaintiffs offer no evidence that the township failed to train its officers to engage in the activities at issue in this case. Nor do they offer any evidence that the RTPD was aware of prior unconstitutional acts such that the need for further training was "obvious". *Cf. Stemler v. City of Florence,* 126 F.3d 856, 1997 WL 615760 at *18 ("Furthermore, a plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond. ") Consequently, the court must grant summary judgment to Ravenna and the RTPD on each of Plaintiffs' federal claims.[8]

---

8. The RTPD is a subdivision of the·Ravenna Township municipal government and is not a separate legal entity. Consequently, for the purposes of this motion, the court consider the RTPD's rights and those of township to be one and the same. *Cf. Damron v. Pfannes,* 785

### C.

Defendants also assert that they are entitled to summary judgment on Plaintiffs' claims under Ohio law. First, they argue that Ravenna and the RTPD are immune from liability under Ohio Rev.Code § 2744.02(A)(1) (West 1997). Under that provision, "[e]xcept as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental ... function." Both the Ohio legislature and its courts recognize police activity as perhaps the quintessential governmental function. *See, e.g., Sawicki v. Village of Ottawa Hills,* 37 Ohio St.3d 222, 225, 525 N.E.2d 468 (1988) (noting that "[t]he current law as expressed in ... R.C. 2744.02(A)(1) appears to immunize municipal corporations from liability deriving from the actions of their police officers"); *Lindow v. City of North Royalton,* 104 Ohio App.3d 152, 158, 661 N.E.2d 253 (1995) (holding that "[t]he Ohio legislature enacted R.C. 2744.01(C)(2), which provides that the provision or nonprovision of police ... is a governmental function."). Moreover, none of the provisions of § 2244.02(B) apply in this case. As a result, the court finds Ravenna and the RTPD are immune from liability on Plaintiffs' state law claims, and are entitled to summary judgment with respect to those claims.

Second, Defendants argue that Chief Carver is also immune under the Ohio Revised Code from liability on Plaintiffs' state law claims. Under Ohio Rev.Code § 2744.03(A)(7) (West 1997), a municipal employee is immune unless, inter alia, "his acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." In moving for summary judgment, a defendant must establish that there are no "genuine issues of material fact." Fed. R. Civ. Pro. 56. As the court has discussed in reviewing Plaintiffs' federal claims, the par-

ties offer conflicting evidence as to Chief Carver's state of mind in carrying out his duties during and after the October 1 raid, creating a genuine issue of material fact. As a result, the court must leave the determination of that state of mind to a jury of Chief Carver's peers.

## V. *CONCLUSION*

A motion for summary judgment is not a trial in itself. A plaintiff facing such a motion is not required to produce evidence sufficient to convince the court of the merit of his claims. Instead, a plaintiff need only demonstrate that material facts remain at issue and in genuine dispute. Nevertheless, a motion for summary judgment places a burden on the plaintiff to offer evidence upon which a reasonable jury *could* rely in finding in his favor. When a plaintiff does not satisfy this burden, a district court is compelled under Fed. R. Civ. Pro. 56 to find that the defendant is entitled to judgment as a matter of law.

In this case, Plaintiffs do not meet their burden with respect to a variety of claims. In sum, the court hereby GRANTS Defendants' motion, but only IN PART. In particular, the court finds that genuine issues of material fact remain as to Chief Carver's liability under § 1983 for seizing Plaintiffs' truck, and as to his liability on Plaintiffs' state law claims. The court finds that no such issue remains as to his liability on Plaintiffs' other federal claims, as well as Ravenna Township and the RTPD's liability on all of Plaintiffs' claims.

The parties shall take notice that this case is scheduled for a final pretrial conference on January 5, 1998 at 10:00 a.m. and trial on January 6, 1998 at 8:00 a.m., on a two-week standby basis.

IT IS SO ORDERED.

---

F.Supp. 644, 646 (E.D.Mich.1992) (holding that "[a] municipal police department is not a legal entity separate from its parent city.... To name the Department as a separate defendant is redundant." (citing *Waller v. Butkovich,* 584 F.Supp. 909, 925 (M.D.N.C.1984); *Williams v. Baxter,* 536 F.Supp. 13, 16 (E.D.Tenn.1981); *Hilliard v. New Jersey Army Nat'l Guard,* 527 F.Supp. 405, 408 (D.N.J.1981); *Moomey v. City of Holland,* 490 F.Supp. 188, 190 (W.D.Mich.1980))).