FARM LABOR ORGANIZING
COMMITTEE, et al.,
Plaintiffs,

v.

The OHIO STATE HIGHWAY
PATROL, et al.,
Defendants.

No. 3:96CV7580.

United States District Court,
N.D. Ohio,
Western Division.

April 20, 2000.

John Mark Finnegan, William B. Senhauser, Equal Justice Foundation, Toledo, OH, for Plaintiff.

Allen P. Adler, Carol Hamilton O'Brien, Office of Attorney General, Corrections Litigation Section, Columbus, OH, Tomi L. Dorris, Office of Attorney General, Ohio State Highway Patrol, Columbus, OH, for Defendants.

## ORDER

CARR, District Judge.

This is a civil rights case involving the questioning of Hispanic motorists about their immigration status by the Ohio State Highway Patrol (OSHP). This court has jurisdiction pursuant to 28 U.S.C. § 1331. Pending is plaintiffs' motion for reconsideration of my September 8, 1999 Order. (Doc. 111). For the following reasons, plaintiffs' motion for reconsideration shall be granted in part and denied in part.

## BACKGROUND

Plaintiffs are migrant workers who claim that the OSHP, particularly members of its Traffic and Drug Interdiction Team (TDIT), violated their constitutional rights by interrogating them about their immigration status, and, in some cases, confiscating immigration documents, on the basis of their Hispanic appearance. Plaintiffs seek a an injunction prohibiting this alleged practice and money damages. (*See* Doc. 44).

On Sunday, March 26, 1995, at approximately 2:00 p.m., named plaintiffs Aguilar and Esparza were traveling eastbound on Interstates 80–90 near the exit for Ohio State Route 2. Aguilar was driving. Trooper Kiefer pulled plaintiffs over for a faulty headlight. Plaintiffs do not dispute the legitimacy of this stop.

Trooper Kiefer approached and asked to see Aguilar's license. Aguilar complied, providing an Illinois license. Trooper Kiefer then ordered Aguilar out of the car and placed him in the back of his cruiser.

Almost immediately, a second cruiser arrived. The trooper from the second cruiser walked a drug-sniffing dog around the outside of plaintiffs' vehicle. The dog "alerted," thereby indicating that plaintiffs' vehicle contained narcotics.[1]

The second trooper demanded to see Esparza's identification; she provided Illinois photo identification. She then was asked to produce her green card, which she did. Esparza was placed in the cruiser with Aguilar. Trooper Kiefer demanded to see Aguilar's green card at that time.

After initial examination of the green cards, Trooper Kiefer asked plaintiffs where they had gotten their green cards and whether they had paid for them, meaning to ask whether they were forged documents. Plaintiffs replied that they had, in fact, paid for their green cards, intending to communicate that they had

---

1. It later was determined that the dog had alerted in error, and that neither Aguilar nor Esparza were carrying drugs.

paid the required processing fees, not that they had obtained their green cards illegally.[2] Trooper Kiefer misunderstood from plaintiffs' answers that the green cards were forged because green cards are not available for purchase.

Rather than return the green cards, Trooper Kiefer retained them for authentication. He did not issue plaintiffs a receipt for their green cards, tell them when they could expect them back if the cards were indeed authentic, or tell them where or how to inquire if they had any questions about the seizure.

On Monday, the day following the seizure of the documents, paralegal Arturo Ortiz contacted the OSHP on behalf of Aguilar and Esparza, but the OSHP could not help him because Ortiz lacked certain information regarding the incident. On Thursday, four days after the seizure, Ortiz obtained this required information from Aguilar and Esparza. He then contacted the OSHP and spoke to Trooper Kiefer. Trooper Kiefer delivered the green cards later that same day.

In my September 8, 1999 Order, I granted plaintiffs' motion for summary judgment as to the issue of whether Trooper Kiefer violated the Fourth Amendment by retaining Aguilar's and Esparza's green cards for four days, and denied plaintiffs' motion for summary judgment as to all other issues and all other defendants. In addition, I granted summary judgment in favor of defendants Marshall, Davies, Healy, Elling, Elders, Blue, Ambrose, Baronowski, Courtney, Laubacher, Piatarek, Pape, Stevens, Unger, and Williams, and denied Trooper Kiefer's motion for summary judgment. Lastly, I dissolved the preliminary injunction I previously had granted. (Doc. 67).

**2.** It is undisputed that Esparza and Aguilar have difficulty communicating in English and the exchange with Trooper Kiefer took place in English.

**3.** Plaintiffs correctly point out that my September 8, 1999 Order does not address these

Plaintiffs now move this Court to reconsider the dismissal of their equal protection, 42 U.S.C. § 1983 and Title VI claims.[3] In opposition, defendants raise two affirmative defenses, one based on standing and the other on the applicable statute of limitations.

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

issues, which were raised in their original motion for summary judgment. (Doc. 77). Thereafter, the parties' subsequent briefs focused exclusively on the Fourth Amendment, as did my September 8, 1999 Order.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## DISCUSSION

### I. Standing

Defendants argue that I should not enjoin the OSHP from asking motorists about their immigration status on the basis of their Hispanic appearance because Aguilar and Esparza, the class representatives, have no standing. According to defendants, Aguilar and Esparza lack standing to obtain equitable relief because they cannot show that it is likely that they will be questioned about their immigration status and/or have their green cards seized again at some future time. Thus, defendants assert, regardless of the merits of plaintiffs' equal protection, § 1983 and Title VI claims, plaintiffs are not entitled to an injunction, either individually or on behalf of the class they seek to represent.[4]

Plaintiffs disagree, citing evidence that suggests that it is the OSHP's policy to ask Hispanic-looking motorists whether they have proper immigration papers. This, plaintiffs argue, proves that it is inevitable that some members of the class will be subject to ethnically discriminatory questioning, giving the class representatives standing by proxy. In any event, plaintiffs observe that I already made a ruling on standing in their favor. (*See* Docs. 67 and 94).

 Those who seek to invoke the jurisdiction of the federal courts must satisfy Article III of the Constitution by alleging an actual case or controversy. *Flast v. Cohen*, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). An actual case or controversy is characterized by a "personal stake in the outcome" of a lawsuit; this requirement assures that constitutional issues will be presented only when ripe for resolution. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). "Abstract injury is not enough." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). A plaintiff must show that "he has sustained or is immediately in danger of sustaining some direct injury" as a result of the challenged conduct; the injury or threat of injury must be "real and immediate," not "conjectural" or "hypothetical." *Id.* (citing *Golden v. Zwickler*, 394 U.S. 103, 109–10, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *United Public Workers of America v. Mitchell*, 330 U.S. 75, 89–91, 67 S.Ct. 556, 91 L.Ed. 754 (1947); *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)). Further, the injury must be one that is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Kardules v. City of Columbus*, 95 F.3d 1335, 1352 (6th Cir.1996) (quoting

---

**4.** Plaintiffs filed a class action complaint, which later was amended. (Doc. 44). Aguilar and Esparza were added as class representatives in the amended complaint. (*Id.* at ¶ 8). On May 15, 1998, plaintiffs moved to have the class certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. (Doc. 78). Plaintiffs proposed that the class be defined as "all current and future Hispanic motorists and/or passengers traveling in Ohio, who are involved in traffic stops by officers, agents or employees of the Ohio State Highway Patrol, and are questioned about immigration matters, or suffer the seizure of their lawfully issued immigration documents." (*Id.* at 3). In my August 17, 1998 Order, I certified the class as proposed by plaintiffs. (Doc. 94).

*Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

■ Synthesizing these principles, the Supreme Court has articulated a three part test for a party to have standing to sue:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.' Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not ... [t]he result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted). The party invoking federal jurisdiction bears the burden of establishing its standing. *Id.* at 561, 112 S.Ct. 2130.

As plaintiffs rightfully point out, I previously determined that plaintiffs had carried their burden. (Docs. 67 and 94). Upon reconsideration, however, my decision on standing requires clarification and revision.

The Supreme Court recognizes that there is not much that separates the injury in fact element of Article III standing from the need to show "likelihood of substantial and immediate irreparable injury" as a prerequisite to obtaining an injunction. *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (the case or controversy elements under Article III "shade into those determining whether the complaint states a sound basis for equitable relief."). Given this overlap, courts (and parties) often combine Article III analysis and equitable relief analysis. But it is important to keep in mind that these are two distinct inquiries, and that it is possible to have standing to assert a claim for damages to redress past injury, while, at the same time, not have standing to enjoin the practice that gave rise to those damages. This may be so even if the practice is likely to continue. *Lyons,* 461 U.S. at 105, 103 S.Ct. 1660 (just because a plaintiff may have standing to obtain damages to remedy past harm "does nothing to establish a real and immediate threat that he again" would be harmed, which is a necessary precondition to having standing to seek an injunction).

■ Indeed, that is the irony of this case and cases like it. There can be little dispute that Aguilar and Esparza have standing to sue for damages on an equal protection theory because they allege they were asked about their immigration status on the basis of their Hispanic appearance, and, further, had their green cards seized. (*See* Doc. 67 at pp. 2–3). To have standing to enjoin such race-based treatment, however, these named plaintiffs must show that they are likely to be asked about their immigration status and/or have their green cards seized *again* at some time in the reasonably near future. *Lyons,* 461 U.S. at 111, 103 S.Ct. 1660 (absent a showing that the plaintiff would again be wronged in a similar way, the plaintiff had no standing to pursue an injunction). *See also Ellis v. Dyson,* 421 U.S. 426, 434, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975) (Article III required that plaintiffs show a "credible" and "genuine" threat that they again would be prosecuted under a challenged loitering law). While past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury, "[p]ast exposure to illegal conduct does not in itself show a ... case or controversy" sufficient to support an injunction. *O'Shea,* 414 U.S. at 495–96, 94 S.Ct. 669.

■ In light of the evidence propounded to date, I cannot find support for plaintiffs'

claim that Aguilar and Esparza likely will be stopped again, and again asked questions about their immigration status or have their green cards seized. Though Aguilar and Esparza both have relatives in Ohio, and represent that they expect to travel Ohio's highways in the future,[5] it is undisputed that during their past travels in Ohio, they only were stopped and questioned once. (*See* Amended Complaint at ¶ 8). They do not travel to or in Ohio on a regular basis because they reside in Chicago, Illinois. (*Id.* at ¶ 34).

Accepting as true plaintiffs' allegation that the OSHP systematically asks Hispanic-looking motorists about their immigration status, and, as a matter of course, seizes green cards, none of this can happen unless a Hispanic motorist is stopped. It is this contingent event that not only diminishes the chances that Aguilar and Esparza will be repeat victims of the practice they challenge, it also might explain why they each were victims on only one occasion in the past.[6]

The plaintiffs' claim of standing in this case is similar to that of the plaintiff in *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In *Lyons,* the plaintiff sued the City of Los Angeles and certain of its police officers, alleging that in 1976 he was stopped for a traffic violation, and, though he offered no resistance, the officers who stopped him applied a choke-hold. As a consequence of the officers' use of a choke-hold, the plaintiff alleged that he lost consciousness and

suffered damage to his larynx. In addition to seeking damages, his complaint sought injunctive relief against the City of Los Angeles and its police department to bar the use of choke-holds except in situations where an arrestee reasonably appears to be threatening the use of deadly force. The district court entered the injunction, and the Ninth Circuit affirmed.

The Supreme Court vacated the injunction because the plaintiff did not have standing. Though the plaintiff had standing to assert a damages claim, he could not obtain an injunction because it was unlikely that he again would be subject to a choke-hold:

> Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the choke-holds by police officers.... That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish *a real and immediate threat that he would again be stopped for a traffic violation,* or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation on his part.

\* \* \* \* \* \*

In order to establish an actual controversy in case, *Lyons would have had* not

---

5. Aguilar and Esparza attested in affidavits that they visit relatives in Toledo, Ohio, approximately 3–4 times per year.

6. Aguilar's and Esparza's standing with regard to future stops is weakened further by the fact that their stop on March 26, 1995 was lawful. In fact, no stop of any plaintiff in this case has been shown to have occurred without antecedent observation of a traffic violation, and, significantly, there has been no evidence of racial profiling in the initial stopping of Hispanic motorists. Thus, Aguilar and Esparza cannot prove imminency of future injury unless they assert that they will again commit traffic violations for which they

expect to be stopped. Where a party can prevent all risk of constitutional injury by controlling his conduct (without sacrificing any of his rights, privileges, or immunities), his claim of standing, which is predicated on a future unlawful act on his part, is of dubious legitimacy. *See, e.g., O'Shea,* 414 U.S. at 497, 94 S.Ct. 669 ("[I]t seems to us that attempting to anticipate whether and when these respondents will be charged with a crime ... takes us into the area of speculation and conjecture.... We assume that respondents will conduct their activities within the law and so avoid ... exposure to the challenged course of conduct....").

only *to allege that he would have another encounter with the police* but also to make the incredible assertion either, (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 105–06, 103 S.Ct. 1660 (emphasis added).

To be sure, the facts of *Lyons* are distinguishable from those in this case, because here Aguilar and Esparza do allege that 1) officers of the OSHP systematically ask all Hispanic appearing motorists, who are stopped for routine traffic violations, whether they have proper immigration papers and/or confiscate those papers, and 2) the OSHP authorizes this practice. While important, these distinguishing allegations do not, however, show that Aguilar and Esparza will "have another encounter with the police." *Id.*

In *Hodgers–Durgin v. de la Vina,* 199 F.3d 1037 (9th Cir.1999) (en banc), the named plaintiffs' inability to show that they would have another encounter with federal law enforcement officials prevented them from achieving standing to seek an injunction. Plaintiffs in *Hodgers–Durgin* were a class of Hispanic motorists who alleged they were stopped by the Border Patrol along the United States' border with Mexico on the basis of their Hispanic appearance. The class had two named plaintiffs. The first was a United States citizen living in Tucson, Arizona, who described himself as having typically Hispanic features: black hair, dark skin and dark eyes. He traveled two or three days a week on I–19 between Tucson and the border town of Nogales. Despite the fact that he saw agents of the Border Patrol every time he traveled I–19, he only had been stopped once in a ten year period.

The second named plaintiff was a United States citizen who had been living in Rio Rico, Arizona, since 1985. She testified that she had driven on I–19 from Rio Rico to Nogales—a distance of approximately 15 miles—at least four or five times a week, and that whenever she did she saw the Border Patrol. Though she regularly saw agents of the Border Patrol along I–19, she only had been stopped once in approximately ten years.

Both named plaintiffs sought an injunction to stop the Border Patrol from pulling over motorists who looked Hispanic. The district court denied the request for an injunction on standing grounds. Upholding the denial of the injunction, the Ninth Circuit, sitting en banc, agreed that neither named plaintiff could establish, based on having been stopped once, that he or she would be stopped in the future by the Border Patrol:

> Based on plaintiffs' own factual record, we believe that it is not sufficiently likely that ... [named plaintiffs] will again be stopped by the Border Patrol.
>
> \* \* \* \* \* \*
>
> As the Supreme Court recently wrote, translating the language of injunctions and imminency into the language of declaratory judgments and ripeness, 'A claim is not ripe for adjudication if it rests on 'contingent future events that may not occur as anticipated, or indeed may not occur at all." Whether the named plaintiffs are likely to be stopped again by the Border Patrol is simply too speculative to warrant an equitable judicial remedy, including declaratory relief, that would require, or provide a basis for requiring, that the Border Patrol change its practices.

*Id.* at 1044 (citations omitted). In a concurrence, Judge Reinhardt added that "[i]n reality, all we hold in this case is that [the named plaintiffs] ... are not the right plaintiffs to have filed this class action," essentially inviting the substitution of new class representatives who had been stopped by the Border Patrol on multiple occasions. *Id.* at 1047. *Cf. Wooley v. Maynard,* 430 U.S. 705, 712, 97 S.Ct. 1428,

51 L.Ed.2d 752 (1977) (equitable relief was available where plaintiff had been prosecuted three times for obscuring "Live Free or Die" motto on his license plate in a span of five weeks); *Kolender v. Lawson,* 461 U.S. 352, 357 n. 3, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (plaintiff who had been stopped fifteen times had standing to challenge an anti-loitering statute as unconstitutionally vague because there was a "credible threat" that he might be detained again).

Plaintiffs here might have standing to obtain an injunction if they could either: 1) present evidence that Aguilar and Esparza have been stopped and asked about their immigration status with sufficient frequency to give rise to a belief that such inquiries will be made of them in the future, or 2) substitute new class representatives who have been stopped and questioned with greater frequency than they have. Absent satisfaction of either of these requirements, the current named plaintiffs, having been stopped but once, lack standing to seek equitable relief.[7]

■ Finally, it is not enough that the unnamed class members, as a group, almost certainly will be subject to the practice in question: the named plaintiffs themselves must show that they are likely to become repeat victims. *Allee v. Medrano,* 416 U.S. 802, 828–29, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) ("A named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; . . . . Standing cannot be acquired through the back door of a class action."). *See also Hodgers–Durgin,* 199 F.3d at 1040 (quoting *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must alleged and show that they personally have been injured, not the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' "). Thus, the prospect that unnamed class members are likely to be questioned about their immigration status (and have their green cards taken) cannot provide a basis for Aguilar and Esparza to seek an injunction.

In sum, I find that Aguilar and Esparza do not have standing to seek an injunction to prevent the OSHP from asking Hispanic-looking motorists about their immigration status and/or confiscating immigration papers.

## II. Equal Protection

Plaintiffs allege that the OSHP routinely interrogates Hispanic motorists about their immigration status, and, in some cases, confiscates immigration documents, solely on the basis of race or national origin. Such practice, plaintiffs argue, violates the Equal Protection Clause of the

---

7. There is one named plaintiff, Merced Valdez, a United States citizen and resident of Ohio, who alleges three instances where he was stopped and questioned about his immigration status. Because he was stopped three times, Valdez is able to make a strong argument that he likely will be stopped again in the future. Valdez, however, has a different standing problem, as I detailed in my June 24, 1997 Order: he is unable to trace the times he was stopped and questioned to the OSHP. (*See* Doc. 31 at 7). During cross examination at an evidentiary hearing held November 21–22, 1996, (Docs. 26–27 [Hrg.]), Valdez testified that the first time he was stopped and asked to produce documentation of citizenship, an officer of the Defiance, Ohio police department—not the OSHP—conducted the stop. (Hrg. at 175). As to the other two times he was stopped, the OSHP has no record of this, though the OSHP consistently keeps such records. Meanwhile, traffic records do indicate that non-OSHP agencies had made inquiries of Valdez's immigration status, suggesting that Valdez was confusing the actions of municipal and other local law enforcement agents with agents of the OSHP. (Hrg. at 245–250; Doc. 31 at 13). Thus, I determined that the evidence was too uncertain to grant Valdez standing. (*Id.*). No new evidence has been developed since 1997, to my knowledge, that would cause me to rethink my position.

Fourteenth Amendment, notwithstanding my previous ruling on searches and seizures under the Fourth Amendment. Defendants respond that plaintiffs have failed to prove facts that would support their claims, and deny treating Hispanic motorists differently than motorists of any other race or ethnicity.

■■■■ Citizens are entitled to equal protection of the laws at all times. Central to the notion of equal protection is "the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Law enforcement is quintessentially official conduct—the police function being "one of the basic functions of government." *Foley v. Connelie,* 435 U.S. 291, 297, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978). "If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred." *United States ' v. Avery,* 137 F.3d 343, 355 (6th Cir.1997). *See also United States v. Taylor,* 956 F.2d 572, 578 (6th Cir.1992) ("[A] general practice or pattern that primarily targeted minorities" would give rise to "due process and equal protection constitutional implications cognizable by this court."); *United States v. Jennings,* 985 F.2d 562, 1993 WL 5927, at *4 (6th Cir. Jan.13, 1993) (unpublished opinion) ("A law enforcement officer would be acting unconstitutionally were he to ... consensually interview a person of color solely because of that person's color, absent a compelling justification.").

"A person cannot become the target of a police investigation solely on the basis of skin color." *Avery,* 137 F.3d at 354. Accordingly, the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment's prohibition against unreasonable searches and seizures. *Id.* at 352.

■■■■ To prevail under the Equal Protection Clause, the victim of discrimination "must prove the decision makers in his case acted with discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). "Determining whether invidious discriminatory purpose was a motivating factor" behind a law enforcement officer's actions "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). *See also Avery,* 137 F.3d at 355 ("Often, it is difficult to prove directly the invidious use of race ... Accordingly, discrimination can be proved through direct evidence, which seldom exists, or inferences ... drawn from ... circumstantial evidence.").

■■■■ The burden rests on plaintiffs to show, by a preponderance of the evidence, that they were treated differently than similarly situated non-minorities. *Jennings,* 985 F.2d 562, 1993 WL at *4. Once such a prima facie case is made, the burden shifts to defendants to either 1) rebut the presumption of unconstitutional action by articulating a race-neutral reason for its action, or 2) identify a compelling government interest for its race-based conduct. *Id.* (citing *Arlington Heights,* 429 U.S. at 270–71 n. 20, 97 S.Ct. 555). *See also Avery,* 137 F.3d at 356 ("Once a prima facie case is established ..., the government must articulate a race-neutral reason for its action, or identify a compelling governmental interest in the race-based interviews.").

Because I find that plaintiffs have satisfied their prima facie burden, and because defendants' rebuttal is insufficient as a matter of law, plaintiffs' motion for reconsideration is well taken.

### A. Plaintiffs' Prima Facie Evidence

Plaintiffs cite evidence which, they allege, indicates a pattern and practice of questioning Hispanic motorists on the ba-

sis of their appearance. Plaintiffs highlight the testimony of Lieutenant William D. Healy, a twenty-two year veteran of the OSHP. Since June 1992, Lt. Healy has served as the coordinator of the TDIT. In that position, Lt. Healy has been responsible for providing guidance, direction, supervision, and training for all TDIT officers. Lt. Healy's duties include monitoring the quality of the TDIT. (Healy Dep. at 18).

Beginning in 1995, the OSHP—particularly its TDIT unit—began taking a more active role in the enforcement of federal immigration laws. According to Lt. Healy, after determining that an individual may be an illegal immigrant, a member of the OSHP will contact the Border Patrol and detain the suspect until the Border Patrol arrives. (*Id.* at 23). By Lt. Healy's admission, the OSHP has detained hundreds of motorists who were suspected to be illegally in the United States following routine traffic stops; such detention, in all likelihood, was precipitated by answers given to questions regarding the motorists' immigration status. (*Id.* at 20).

Lt. Healy acknowledged that the OSHP has been known to inquire into motorists' immigration status during routine traffic stops. According to Lt. Healy, a driver might be asked about his immigration status because an officer would "like to know whether or not you have a legal right to be here . . . ." (Healy Dep. at 51). Lt. Healy approved of officers inspecting immigration documents, stating that "I would have no problem with a Trooper asking to see the alien registration card . . . it's a consensual encounter." (*Id.* at 60).

Lt. Healy further testified that he is aware of officers seizing alien registration cards, some of which were later determined to be legitimate. (*Id.* at 32). Although such seizures are "not a common occurrence," Lt. Healy admitted that the OSHP has, in fact, seized legitimate immigration documents and delivered those documents to federal authorities. (*Id.* at 32, 70). Lt. Healy indicated during his

testimony that there are no plans for the TDIT, which he runs, to change its policies. (*Id.* at 114–16).

Members of the OSHP receive little or no training in the area of federal immigration law. Lt. Healy testified that he once arranged for the TDIT to sponsor a training session on the identification of fraudulent immigration documents. (*Id.* at 12–15, 34). Only TDIT officers participated in this training. (*Id.* at 14). The two-hour session did not, however, address substantive issues related to immigration. (Hrg. at 288–90).

Because only one training session of this sort has been held, no TDIT officer joining the OSHP after April 1993 has received any formal training in the identification of fraudulent immigration documents, let alone in the assessment of what articulable facts would suggest that a motorist is an illegal immigrant. (Healy Dep. at 55, 96–97, 101–04; Hrg. at 290). Indeed, Lt. Healy himself testified that he does not know how to tell if a motorist is an alien, having not the "foggiest idea" what an alien might look like. (Healy Dep. at 30–31).

Given defendants' admitted lack of training in the identification of illegal immigrants, the only reasoned basis on which to question a motorist about immigration status, plaintiffs argue, is the motorist's Hispanic appearance coupled with indicators of Hispanic ethnicity, such as 1) inability to speak English, or 2) appearing to be a migrant worker.

Plaintiffs point out that Sergeant Bruce Elling (a supervisor in the TDIT) testified that the vast majority of green cards examined and seized by the TDIT belonged to Hispanic motorists; in fact, Sgt. Elling was not aware of any green cards being seized from non-Hispanics. (Elling Dep at 68; *see also* Stockman Dep. at 44–45; Kiefer Dep. at 77; Smart Dep at 64). According to William Mitchell, the supervisor of all Border Patrol personnel working in northwestern Ohio, more than 90 per-

cent of the OSHP's immigration inquiries "concern[ed] Hispanics." (Mitchell Dec. at 2).

Moreover, the TDIT provides officers with a list of immigration related questions in English along with their Spanish translations, but there is no evidence that such translations are provided in any other languages. (Baranowski Dep. at 72–73). Some deposed officers testified that they were under the impression that one must speak English to be a United States citizen. According to Sgt. Elling: "I mean, if [motorists] don't speak [English] at all, I mean that's definitely an indicator of something amiss because you have to speak English to become an American citizen." (Elling Dep. at 35, 60–61). Lt. Barry Elder echoed Sgt. Elling's sentiments, testifying that one must speak English to be a citizen of the United States and/or a permanent resident alien. (Elder Dep. at 67). Trooper Smart similarly thought that fluency in English was a prerequisite to obtaining citizenship. (Smart Dep. at). And Trooper Kiefer testified that if he has a hard time understanding what drivers or passengers are saying or if they have a hard time understanding him, he will ask for a green card. (Kiefer Dep. at 39, 60–61, 172–74).

In addition, Lt. Elder testified he became suspicious that a motorist was an illegal alien if the motorist was going to pick crops, was coming from Florida or Texas, had little money, was driving an older vehicle, and/or was wearing old clothes. (Elder Dep. at 49–53). Plaintiffs argue that this describes the typical migrant worker, who in almost every case is of Hispanic descent. Further, plaintiffs argue that these are precisely the factors courts have disfavored as giving rise to an inference that a motorist is illegally in the country. *See Ramirez v. Webb*, 599 F.Supp. 1278, 1283 (W.D.Mich.1984) (a motorist's ethnic appearance, the condition of his car, the manner in which he dresses, and the presence of out-of-state plates on his car "cannot justify the subjugation of individual rights.").

Plaintiffs also cite the testimony of Trooper Kiefer, who testified that when he found Hispanic passengers hiding under a blanket, he called the Border Patrol, but that if he found white people hiding under a blanket, he would not. (Kiefer Dep. at 83). Sgt. Elling likewise testified that he would not call the Border Patrol regarding a motorist "unless [he] would think that they would probably be Hispanic in nature." (Elling Dep. at 33–34). And Trooper Pahl admitted that she once had contacted the Border Patrol after coming across two Hispanic men whose car had broken down, but that she wouldn't do the same for a white man. (Pahl Dep. at 37).

To further illustrate what they believe to be the OSHP's race-based investigatory tactics, plaintiffs have introduced a videotape (with audio) showing the stop of a Hispanic motorist, Heriberto Navarro, and his two Hispanic passengers. Navarro was pulled over for driving slightly above the speed limit. The videotape shows Navarro, who speaks accented English, conversing with Trooper Kiefer after Trooper Kiefer approached the passenger's side of the stopped car. Next, Navarro and his passengers provided their California driver's licenses to Trooper Kiefer on his request to see photo identification. Trooper Kiefer then questioned Navarro about his destination. Navarro answered by stating that he was driving to Michigan for vacation. Trooper Kiefer informed Navarro that he was going to let him off for the speeding violation, but that he first had to run the licenses through a police computer. At this point, Trooper Kiefer walked away from Navarro's car toward his patrol car. After two or three steps, however, Trooper Kiefer turned back to ask Navarro where he was born and whether he and his passengers were in possession of permanent resident alien cards.

Plaintiffs believe the videotape demonstrates that Navarro and his companions were questioned about their immigration

status solely on the basis of their Hispanic appearance, because nothing about their conduct suggested that they were in the country illegally; indeed, Trooper Kiefer had been prepared to release Navarro so long as Navarro's license cleared.

Defendants counter that while plaintiffs' evidence shows that in some cases Hispanic motorists have been asked about their immigration status, no evidence presented thus far indicates that Hispanic motorists are treated differently than non-Hispanic motorists. This, defendants emphasize, is the key equal protection issue, given that I already have decided that it is legitimate for officers, under the Fourth Amendment, to question motorists about their immigration status during the time it takes to complete a lawful traffic stop. (Doc. 109 at 4). In other words, defendants argue that unless plaintiffs have evidence showing that Aguilar and Esparza were singled out, the mere fact that Hispanic motorists have been subject to questions regarding their immigration status does not prove an equal protection ·violation.

■ Defendants' theory does not fit the facts of this case. Plaintiffs have introduced direct evidence that Hispanic motorists are treated differently than white motorists. Trooper Kiefer, Sgt. Elling, and Trooper Pahl all testified that, in their experience, they would refer Hispanic motorists to the Border Patrol when, in precisely the same circumstances, they would not refer someone who was white (i.e., not of Hispanic appearance).

■ Moreover, inferential evidence of a discriminatory practice is more than enough. *See Avery,* 137 F.3d at 355 (" 'Necessarily, an invidious discriminatory purpose may often be inferred from the totality of relevant facts ....' ") (quoting *Washington,* 426 U.S. at 242, 96 S.Ct. 2040). Here, such inferential evidence abounds. Almost all motorists whose green cards were seized were Hispanic. It would not be illogical to conclude from this, together with other evidence present-

ed by plaintiffs, that most motorists (including Aguilar and Esparza) asked about their green cards were Hispanic-looking. Further, defendants' lack of training in the area of immigration law, and their seeming inability to articulate what might give rise to a reasonable suspicion that a motorist is illegally in the country, make it highly plausible that racial stereotyping influences the kinds of questions an officer chooses to ask during a traffic stop. This is particularly true where so many officers are misinformed about the language skills required for citizenship, and many of the migrant workers subjected to questioning have difficulty speaking English.

Finally, the circumstances surrounding the stop of Aguilar and Esparza help establish plaintiffs' prima facie case. Defendants argue that the seizure of Aguilar's and Esparza's immigration documents can be explained by the "alert" of a drug-sniffing dog immediately before their documents were taken from them. But the potential presence of drugs in a motorist's car says nothing about the likelihood that the motorist is an illegal immigrant. Defendants admit as much. Lt. Healy testified that there is no correlation between the possession of drugs and being illegally in the country, a view shared by other OSHP officers. (Healy Dep. at 106; *see also* Baranowski Dep. at 105–06; Elling Dep. at 25; Laubacher Dep. at 70). If there is no such correlation, the alert cannot justify questions about immigration. Yet, beyond the dog alert, defendants have articulated no reason why Aguilar and Esparza were asked for their green cards.

In sum, I find that plaintiffs have satisfied their prima facie burden that the OSHP discriminates against Hispanic motorists in its immigration questioning, and, more specifically, have demonstrated that Trooper Kiefer deprived Aguilar and Esparza of their equal protection rights.

### B. Defendants' Rebuttal

To rebut plaintiffs' prima facie case, defendants must 1) articulate a race-neutral reason for their action, or 2) identify a

compelling government interest for their race-based conduct. *Avery*, 137 F.3d at 356. Defendants have done neither.

▮ No defendant has explained what race-neutral criteria are used to determine whether a motorist should be asked to produce immigration documents. While defendants deny taking action based on the race or national origin of an individual, more than a disavowal of discriminatory conduct is required. Defendants are obligated to articulate the race-neutral, precipitating factors behind questions relating to a motorist's immigration status. They have not done so.

In the alternative, defendants have the option of providing a compelling government interest for acknowledged race-based conduct. Defendants, however, have shied away from this option, steadfastly maintaining that their actions are not race-based.

In sum, defendants have failed to satisfy their rebuttal burden. Aguilar and Esparza, to the extent they can satisfy the requirements of § 1983 and Title VI, are entitled to summary judgment on their equal protection claims.

### III. 42 U.S.C. § 1983

▮ There are numerous individual defendants in this case.[8] Section 1983 requires Aguilar and Esparza (as class representatives) to establish a causal connection between their injuries and each defendant's conduct. Absent such link, no liability may attach, despite defendants' collective inability to rebut plaintiffs' evidence of discrimination. *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 659 (6th Cir.1994) (citing *Doe v. Sullivan County, Tennessee*, 956 F.2d 545, 550 (6th Cir.1992)) ("A violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury.").

Further, defendants are sued in varying capacities: some are sued as officials while others are sued as individuals. And some are sued for active participation in the stop of Aguilar and Esparza while others are sued because they exercised supervisory authority. Depending on the capacity in which a defendant is sued, different immunity rules apply. Issues of causation and immunity, moreover, often intertwine in § 1983 analysis.

▮ To establish a claim under § 1983, a plaintiff must prove: 1) that conduct was committed by a defendant acting under the color of state law, and 2) the defendant's conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Sargi v. Kent City Board of Educ.*, 70 F.3d 907, 913 (6th Cir.1995). It is axiomatic that equal protection falls within the ambit of "rights, privileges, or immunities" § 1983 was designed to preserve. *See, e.g., French v. Heyne*, 547 F.2d 994, 997 (7th Cir.1976) ("Redress for denial of equal protection is available under § 1983.").

The following subsections consider plaintiffs' evidence of causation with respect to each defendant, and determine whether any defendants are entitled to immunity.

#### 1. Trooper Kiefer: Sued In His Individual Capacity

Trooper Kiefer physically participated in the questioning of Aguilar and Esparza, and he confiscated their green cards. Plaintiffs seek to hold him personally liable. Trooper Kiefer claims qualified immunity.

▮ When public officials are sued for damages under § 1983 in their individual capacities, they can assert qualified immunity. *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). Officials are entitled to

---

**8.** On June 15, 1998, the OSHP filed a motion for summary judgment, requesting that the § 1983 claims against it be dismissed. Plaintiffs did not oppose this motion. (Doc. 89 at 2).

qualified immunity so long as their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Christophel v. Kukulinsky,* 61 F.3d 479, 484 (6th Cir. 1995). "The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Whether an official protected by qualified immunity may be held personally liable turns on the "objective legal reasonableness" of his acts. *Johnson v. Estate of Laccheo,* 935 F.2d 109, 111 (6th Cir.1991).

■ A court evaluating a claim of qualified immunity "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). "Deciding the constitutional question before addressing the qualified immunity question promotes clarity in the legal standards for official conduct, to the benefit of both officers and the general public." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

■ Here, there can be no dispute that Trooper Kiefer should have understood, in 1995, that questioning *motorists* about their immigration status on the basis of their race or ethnicity was unconstitutional. For well over 100 years, a bedrock principal of our constitutional democracy has been that people should be treated equally under the law, and that government actors cannot treat individuals differently bases on their ethnic background. *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Accordingly, the Sixth Circuit has admonished the police not to "unevenly apply the laws against a citizen because of his race . . . ." *Gardenhire v. Schubert,* 205 F.3d 303, 320

(6th Cir.2000). Indeed, the *Gardenhire* court held that by 1996 it had long been "clearly established that police officers could not selectively enforce . . . [the] laws based on racial distinctions." *Id.* The same can be said for 1995, when Aguilar and Esparza were stopped. Thus, Trooper Kiefer has no immunity from suit.

■ Further, Trooper Kiefer's conduct clearly resulted in the injuries claimed by Aguilar and Esparza, supporting a causal connection.

In sum, plaintiffs' motion for summary judgment—on Aguilar's and Esparza's § 1983 claims that they were deprived of their equal protection rights—shall be granted as to Trooper Kiefer.

2. **Defendants Marshall, Healy, Elling And Elders: Sued In Their Official Capacities**

Plaintiffs sued defendants Marshall, Healy, Elling and Elders in their official capacities to obtain an injunction. (*See* Amended Complaint at ¶¶ 18, 20–22). As previously discussed, however, Aguilar and Esparza do not have standing to obtain injunctive relief. Thus, plaintiffs' claims against defendants Marshall, Healy, Elling and Elders in their official capacities shall be dismissed.

3. **Defendants Marshall, Davies, Healy, Elling And Elders: Sued As Supervisors In Their Individual Capacities**

■ Although Aguilar and Esparza do not claim that Marshall, Davies, Healy, Elling and Elders participated in their stop, plaintiffs seek to impose liability on them personally as the supervisors of Trooper Kiefer, who was involved. Supervisory officials may not be found vicariously liable for the actions of their subordinates under § 1983. *Monell v. Department of Social Services,* 436 U.S. 658, 691–694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). To

hold a supervisor liable, a plaintiff must demonstrate that the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Swales v. Township of Ravenna*, 989 F.Supp. 925, 938 (N.D.Ohio 1997). Thus, at minimum, plaintiffs in this case must show that Marshall, Davies, Healy, Elling and Elders "implicitly authorized, approved or knowingly acquiesced" in the deprivation of Aguilar's and Esparza's constitutional rights. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984); *Hays v. Jefferson County, Kentucky*, 668 F.2d 869, 874 (6th Cir.1982). This ensures that supervisors sought to be held accountable actually "caused" the deprivation at issue. *Doe v. Claiborne County, Tennessee*, 103 F.3d 495, 511 (6th Cir. 1996).

 Further, when the allegation is that a supervisor improperly trained a subordinate, the supervisor may be liable only where his failure to train evinces "deliberate indifference" to the public. *Sova*, 142 F.3d at 904 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Here, plaintiffs argue that the discriminatory treatment of Hispanic motorists was wide-spread within the OSHP. That

such an atmosphere developed under the supervision of Marshall, Davies, Healy, Elling and Elders reflects, in plaintiffs' view, that they authorized, approved or knowingly acquiesced in race-based immigration questioning. Plaintiffs submit that Trooper Kiefer adopted investigatory tactics that he and his fellow patrolmen learned from more experienced officers, including their supervisors. It is improbable, plaintiffs claim, that Trooper Kiefer's actions did not comport with the OSHP's general practices. Rather, it is more likely that Trooper Kiefer simply was doing what his supervisors' implicitly sanctioned.

More generally, plaintiffs allege that defendants Marshall, Davies, Healy, Elling and Elders cannot distance themselves from Trooper Kiefer when they did practically nothing to train him in how to identify illegal immigrants in a race-neutral manner. Plaintiffs contend that these supervisors directed the OSHP's rank and file to enforce federal immigration laws more aggressively, without avoiding, through training, the likelihood that racial bias would influence their decisions in the field. In plaintiffs' view, this set the stage for Trooper Kiefer's handling of the stop of Aguilar and Esparza.[9]

Defendants respond by adducing evidence that Marshall, Davies, Healy, Elling and Elders did not participate, directly, in

9. Specifically, plaintiffs allege that Kenneth Marshall acted as the Superintendent of the OSHP during a time when Policy 9–902.08 was being enforced. Policy 9–902.08 provided guidelines for "handling suspected illegal aliens." (*See* Plaintiffs' Ex. 1). According to plaintiffs, Policy 9–902.08 spurred the stepped-up enforcement of federal immigration laws in Ohio. Colonel Davies also was a Superintendent while Policy 9–902.08 was in effect.

Plaintiffs allege that Lt. Healy was one of the architects of the OSHP's immigration enforcement policies, and that he approved of officers inquiring into a motorists' immigration status. Lt. Healy organized the single training session on immigration for members of the TDIT unit, during which he taught officers how to identify forged green cards; Lt. Healy admitted, however, that he himself

had no idea how to recognize an illegal immigrant. Plaintiffs further allege that Lt. Healy was informed that Aguilar and Esparza had had their green cards taken from them, yet defended Trooper Kiefer's actions and refused to address Aguilar's and Esparza's complaints.

Plaintiffs allege that Sgt. Elling was a supervisor in the TDIT unit, and that he helped determine the OSHP's immigration policies. Plaintiffs also allege that Sgt. Elling, after being told of the incident involving Aguilar and Esparza, did nothing to prevent officers from confiscating and destroying green cards in the future.

Finally, plaintiffs allege that Lt. Elder headed a post of the Ohio Turnpike between Exits 3 and 3A south of Toledo, Ohio, where he assisted in the enforcement of federal immigration laws.

Aguilar's and Esparza's stop, and therefore could not have authorized or approved of it. (Docs. 84 and 93).

▉ I find there to be a genuine factual dispute whether Marshall, Davies, Healy, Elling and Elders "implicitly authorized, approved or knowingly acquiesced" in the deprivation of Aguilar's and Esparza's constitutional rights. There is sufficient evidence to suggest that, at all supervisory levels of the OSHP, patrolmen (including Trooper Kiefer) were encouraged to ask Hispanic motorists about their immigration status. However, this evidence is not enough to support summary judgment in plaintiffs' favor. Therefore, this issue shall be left for a jury to resolve, and the parties' respective motions for summary judgment shall be denied.[10]

4. **Troopers Ambrose, Blue, Baranowski, Courtney, Laubacher, Piatarek, Pape, Stevens, Unger and Williams: Sued In Their Individual Capacities**

▉ Plaintiffs have sued Troopers Ambrose, Blue, Baranowski, Courtney, Laubacher, Piatarek, Pape, Stevens, Unger and Williams in their individual capacities. None of these Troopers, however, participated in Trooper Kiefer's stop of Aguilar and Esparza, and plaintiffs do not allege that these Troopers exercised supervisory responsibility. That they may have interrogated unnamed class members on race-based grounds does not establish a causal link to Aguilar and Esparza. Therefore, plaintiffs' § 1983 claims of deprivation of equal protection shall be dismissed as to Troopers Ambrose, Blue, Baranowski, Courtney, Laubacher, Piatarek, Pape, Stevens, Unger and Williams.

## IV. Title VI

Plaintiffs allege that the OSHP has engaged in a pattern and practice of questioning Hispanic-looking motorists on the

basis of their Hispanic appearance in violation of Title VI of the Civil Rights Act of 1964. 42 U.S.C. § 2000d, *et seq.* Title VI provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

*Id.*

▉ The Supreme Court has noted that Congress "understood Title VI as authorizing an implied private right of action for victims of the prohibited discrimination." *Cannon v. University of Chicago,* 441 U.S. 677, 703, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). "The proper defendant in a Title VI case is an entity rather than an individual." *Farmer v. Ramsay,* 41 F.Supp.2d 587, 592 (D.Md.1999) (citing *Jackson v. Katy Independent School District,* 951 F.Supp. 1293 (S.D.Tex.1996)). *See also Buchanan v. City of Bolivar, Tennessee,* 99 F.3d 1352, 1356 (6th Cir. 1996) ("Plaintiff's claim ... fails because she asserts her claim against Lawson and Weaver and not against the school, the entity allegedly receiving financial assistance."). To maintain a private right of action under Title VI, a plaintiff must prove that he was victimized by a "program or activity" that received federal funds. *Buchanan,* 99 F.3d at 1356. There must be a nexus between the alleged discriminatory conduct and the specific program to which federal funds were directed. *David K. v. Lane,* 839 F.2d 1265, 1275–76 (7th Cir.1988). *See also* 42 U.S.C. § 2000d–1 ("Compliance with any requirement pursuant to [Title VI] ... shall be limited in its effect to the particular program, or part thereof, in which ... noncompliance has been so found.").

---

10. If the jury imposes supervisory liability, no defendant would be protected by qualified immunity for the same reasons that deprive Trooper Kiefer of his claim of qualified immunity.

A "program or activity" is defined as "all the operations of" a "department, agency, ... or other instrumentality of a State or of a local government." 42 U.S.C. § 2000d–4a(1)(A). The immunity conferred upon the states by the Eleventh Amendment does not apply to violations of Title VI. *Id.* at § 2000d–7(1); *Franks v. Kentucky School for the Deaf,* 142 F.3d 360, 362–63 (6th Cir.1998).

■ Some courts have found that "Congress did not intend to extend protection under Title VI to any person other than an intended beneficiary of federal financial assistance." *Simpson v. Reynolds Metals Co., Inc.,* 629 F.2d 1226, 1235 (7th Cir.1980). *See also Scelsa v. City University of New York,* 806 F.Supp. 1126, 1140 (S.D.N.Y.1992) ("[T]o establish standing to sue under ... [Title VI] plaintiffs must be the intended beneficiaries of the federal spending program."). This interpretation reads Title VI too narrowly. By its plain language, Title VI affords protection to persons "subjected to discrimination under any program or activity" receiving federal funds. Thus, even if Aguilar and Esparza were not the intended beneficiaries of money flowing to the OSHP (as employees, for instance), they nevertheless can bring a Title VI claim on the grounds that the OSHP qualifies as a "program or activity" that allegedly subjected them to discrimination.[11]

The issue, then, is how the OSHP spends its federal funds.[12] Use of funds is critical because there must be some connection between the plaintiffs' unequal treatment and the federal funds received by the OSHP. *David K. v. Lane,* 839 F.2d at 1275–76.

Plaintiffs have presented evidence that the OSHP receives substantial federal funding. In fiscal years 1995, 1996, and 1997, the OSHP received over $5.6 million from the federal government. (*See* Defendants' Response to Interr. 3). Moreover, Lt. Healy testified that during 1992 and 1993, the TDIT received a $100,000 federal grant, which was used for overtime pay and to purchase equipment. (Healy Dep. at 5–7). Other than this $100,000 grant, however, Lt. Healy does not believe the TDIT has received any federal money. *Id.* Plaintiffs have not introduced any evidence beyond the testimony of Lt. Healy regarding federal funding to the TDIT.

■ A single $100,000 grant to the TDIT, which was spent in 1992 and 1993, is not enough to establish that the TDIT was a federally funded "program or activity" in 1995, when Aguilar and Esparza were stopped and had their green cards seized. Further, though the TDIT is a unit of the OSHP, plaintiffs have offered no proof that the TDIT is one of the specific programs to which the OSHP channeled its federal money. *David K.,* 839 F.2d at 1275–76. The only evidence of distribution comes from the National Highway Transportation Safety Board, which indicates that the OSHP relied on assistance from the federal government to pay for overtime hours spent targeting crash-causing violations (such as speeding and driving under the influence of alcohol) and enforcing commercial vehicle regulations. (*See* Defendants' Response to Interr. 3).

There is no evidence that these funds were allocated to the TDIT. *David K.,* 839 F.2d at 1275–76 (plaintiffs' broad assumption that an entire prison system benefits

---

**11.** Further, 28 C.F.R. § 42.104(b), promulgated under Title VI, provides that a federally funded program or activity cannot provide any "disposition ... to an individual which is different, or is provided in a different manner" based on that individual's race, color or national original. "Disposition" is defined as any "treatment, handling, decision, sentencing, confinement, or other prescription of conduct." *Id.* at § 42.102(j). Clearly, the

process of questioning motorists about their immigration status constitutes a "disposition" within the meaning of Title VI.

**12.** As already discussed, plaintiffs have made out a prima facie case of unequal protection against the OSHP, which has gone unrebutted. (*See* Section II, *supra.,* at 16–22 ).

when one of its programs receives federal funds—thereby causing the entire prison system to be subject to Title VI regulation—was not supported absent proof of such benefit). In fact, defendants have propounded evidence that the TDIT is (and always has been) funded out of Ohio's general operating budget, which, in turn, raises money through gas taxes. Plaintiffs have not rebutted this contention.

 Thus, Aguilar and Esparza can prevail on their Title VI claims only by demonstrating some nexus between 1) the $5.6 million used by the OSHP on overtime pay to reduce crash-causing violations and regulate commercial vehicles, and 2) their stop on March 26, 1995. *Id.* Plaintiffs argue that such a nexus exists. I disagree.

Of course, there are many fathomable reasons why the availability of federal funds for overtime pay might redound to the benefit of all law enforcement activities, even if the primary purpose of having officers work overtime (as in this case) is to address specific concerns, such as automobile crashes and commercial vehicle regulation. One could speculate that the more money the OSHP has for overtime the more OSHP officers will be patrolling Ohio's highways. Thus, federal money dedicated to overtime conceivably could result in an increase in the number of traffic stops that would have occurred without federal assistance. From this postulation, plaintiffs conclude that federal funding earmarked for overtime pay has impacted the number of Hispanic motorists questioned about their immigration status by the OSHP, including Aguilar and Esparza.

Plaintiffs' argument, however, is conjectural. There is no evidence of how the OSHP used its federal money to target crash causing violations and/or regulate commercial vehicles. The record contains

no evidence that the OSHP used federal funds to increase the number of officers on routine patrol. Moreover, there is no evidence that the $5.6 million had any residual effect on the enforcement of federal immigration laws. Particularly, plaintiffs have failed to show that Trooper Kiefer's stop of Aguilar and Esparza was made possible, in whole or in part, by federal funding.

In sum, there is insufficient support for the claim of a nexus between the OSHP's federal funding and any equal protection violation. Plaintiffs' motion for summary judgment on its Title VI claims, therefore, shall be denied as to the OSHP.[13]

## V. Statute Of Limitations

Defendants argue that the two year statute of limitations on civil rights actions bars the claims of Aguilar and Esparza. (Doc. 120 at 4–5). According to defendants, the statute of limitations began running on March 26, 1995, the date Trooper Kiefer stopped Aguilar and Esparza. Plaintiffs filed their class action suit on September 18, 1996, but Aguilar and Esparza were not added as named plaintiffs until June 1997. Thus, defendants argue, Aguilar and Esparza asserted their claims two months too late.

 "The commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (citing *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)). Once the statute of limitations has been tolled, it remains tolled for all putative class members until certification is resolved. *Id.*

In light of *Parker*, the two year statute of limitations was suspended for Aguilar and Esparza (and all other class members)

---

**13.** Because Title VI claims only can be brought against entities, not individuals, plaintiffs' Title VI claims shall be dismissed as to all individual defendants (i.e., defendants Marshall, Davies, Healy, Elling, Elders, Kiefer, Blue, Ambrose, Baranowski, Courtney, Laubacher, Piatarek, Pape, Stevens, Unger, and Williams).

as of September 18, 1996—eighteen months after Aguilar and Esparza were stopped. Accordingly, defendants' statute of limitations argument has no merit.

## CONCLUSION

For the foregoing reasons, on reconsideration of my September 8, 1999 Order, it is hereby

ORDERED THAT

1) Plaintiffs' motion for summary judgment on their § 1983 claims against Trooper Kiefer is granted;

2) Plaintiffs' motion for summary judgment on their § 1983 claims against defendants Marshall, Healy, Elling and Elders (in their official capacities) is denied;

3) Plaintiffs' motion for summary judgment on their § 1983 claims against defendants Marshall, Davies, Healy, Elling and Elders (as supervisors in their individual capacities) is denied; and

4) Plaintiffs' motion for summary judgment on their Title VI claims is denied.

So ordered.